FILED

2012 Mar-05  PM 03:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
ASHLEY MARTINEAR,              }
                               }
      Plaintiff,               }
                               }     CIVIL ACTION NO.
v.                             }     10-AR-2088-S
                               }
NPC INTERNATIONAL, INC.,       }
d/b/a PIZZA HUT,               }
                               }
      Defendant.               }
```

**<u>MEMORANDUM OPINION</u>**

Before the court is the motion of defendant, NPC International, Inc., d/b/a Pizza Hut ("NPC"), for summary judgment as to all claims brought by plaintiff, Ashley Martinear ("Martinear"). Doc. 26. Martinear, a female, former general manager of NPC's Pizza Hut restaurant in Midfield, Alabama, brings claims for sex and pregnancy discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").[1] For the reasons set forth below, NPC's motion for summary judgment will be granted in its entirety.

**FACTS**[2]

NPC is a franchisee of Pizza Hut restaurants. In September 2005, Martinear began working as an assistant manager at NPC's Pizza Hut restaurant in Midfield, Alabama. Martinear's immediate

---

[1] Martinear initially brought a race discrimination claim as well, but she has voluntarily dismissed that claim. *See* Doc. 12.

[2] Because of the procedural posture, all facts are viewed in the light most favorable to Martinear.

supervisor was the general manager of the Midfield Pizza Hut, Keara Noy ("Noy"), and Noy's immediate supervisor was the area general manager for the Birmingham area, Janet St. John ("St. John").

Martinear became pregnant at some point in early 2006. Martinear asked Noy to request cushioned floor mats for the Midfield Pizza Hut because the assistant manager position required long periods of standing.  Soon after Martinear made this request, Noy told her that St. John had decided to demote Martinear from assistant manager to shift leader because she was pregnant and could not perform all of the duties of assistant manager. Martinear hired a lawyer, who contacted NPC's human resources leader, Sherry Davis ("Davis").  Davis told Martinear that she did not know about the decision to demote her and apologized.  NPC restored her to her assistant manager position and provided the floor mats she requested.  Martinear does not know how long she was actually demoted to the shift leader position, and she does not think she lost any pay.[3]  In July 2006, Martinear filed a charge of pregnancy discrimination with the Equal Employment Opportunity Commission ("EEOC").

In 2006 and 2007, Noy and St. John issued Martinear two disciplinary warnings and gave her two performance reviews

---

[3] NPC states that Martinear was never actually demoted, but that she merely believed she was being demoted, and that Davis assured her that she would remain an assistant manager.  NPC also states that Martinear never lost any pay or benefits.

indicating that her performance was below expectations. Despite these issues, in August 2007, when Noy transferred to another restaurant, NPC promoted Martinear to general manager of the Midfield Pizza Hut. In January 2008, Ray Akers ("Akers") replaced St. John as area general manager for the Birmingham area, and thus became Martinear's immediate supervisor. Martinear subsequently received another poor performance review from Akers.

In mid-2008, Martinear became pregnant again. At some point during Martinear's second pregnancy, Akers asked her whether NPC would continue to pay Martinear her salary while she was out on maternity leave, and more specifically, whether the money to pay her salary would come out of NPC's "labor costs".

Because the Midfield Pizza Hut had been robbed several times, NPC converted it to a drive-through-only unit with no restaurant seating. There were frequently only two employees working during the day shift, a manager and a driver, although more employees worked the night shift. NPC's written cash handling and deposit procedures for its restaurants required that, at a minimum, two cash deposits were to be made daily: both a "Pre-Close deposit – made prior to 4:00 p.m." and a "Closing Deposit." However, Martinear says that Noy, St. John, and later, Akers, each told her that at the Midfield Pizza Hut, a deposit was not required to be made before 4:00 p.m., but instead, that the night shift manager could make both deposits, one for the day shift and one for the

night shift, at the same time at the end of the night.  Akers told Martinear that the Midfield Pizza Hut had "special needs," and that the most important rule was that a manager was never supposed to close the restaurant in order to leave to make a deposit.  Akers also told Martinear that the manager on duty did not have a make a day shift deposit if the deposit was a relatively small amount of money, such as $200.00.  Martinear's understanding was that if more than two employees were working the day shift, one of them would make the day shift deposit.  However, Martinear understood that if only two employees were working the day shift, she could not close the restaurant to make a deposit.  According to Martinear, the Midfield Pizza Hut thus operated in violation of NPC's written cash handling and deposit procedures, but this was with the express consent of her supervisors.

In December 2008, NPC made the decision to revise the written cash handling policy as it pertained to NPC's eastern territory, which included the Birmingham area, including the Midfield Pizza Hut.  For the first time, the policy stated: "Managers who violate cash policies resulting in cash loss may be terminated with or without previous written warnings."  With respect to cash deposit procedures, the revised policy continued to state that the minimum daily deposit requirements included both a "Pre-Close deposit – made prior to 4:00 p.m." and a "Closing Deposit."  The policy further stated: "Any cash loss due to not following deposit

4

procedures may result in immediate termination, pending extenuating circumstances."

On December 3, 2008, Akers called a meeting of the Pizza Hut general managers in the Birmingham area, and Martinear attended. During this meeting, Akers distributed NPC's revised cash handling and deposit policy, discussed it with the general managers, and instructed them that it was effective immediately. Akers asked the general managers to sign the revised policy and distribute copies of the policy to their employees. Martinear admits that she attended the meeting and received a copy of the policy, but she states that she never signed the policy.[4]

Two days later, on December 5, 2008, Martinear began working between 8:00 and 9:00 in the morning. She thinks she left in the early afternoon for a doctor's appointment, but NPC's time records indicate that she clocked out at 5:55 p.m. Martinear did not take a cash deposit to the bank before 4:00 p.m., or before she left for the day. Instead, Martinear's shift manager, Bryan Holmes ("Holmes"), told her that he would make both the day and night deposits for her at the end of his shift that night, and she reminded him to do so before she left. That night, Holmes reported that he had been robbed on his way to take the deposits to the

---

[4] NPC has submitted as evidence in support of its motion for summary judgment a copy of the revised cash handling policy that was in Martinear's personnel file, and although the policy appears to contain Martinear's signature and/or initials on each page, Martinear denies ever having signed the policy.

bank, and that the robber had taken all of the money Holmes was supposed to deposit, which was about $2600.00.

During an investigation of the incident the next day, Holmes claimed to police detectives that he went outside with the deposit bags, pulled his car to the side of the building and began adding water to his radiator, when two men walked up to him and told him to give him all of the money in the bags.  When Martinear notified Akers of the robbery, Akers asked Martinear if she had made a cash deposit before her shift ended, and she responded that she had not. When Akers asked why, Martinear responded that Holmes was supposed to make both deposits at the end of his shift.  Akers asked Martinear how much cash was supposed to be deposited from the day shift, and Martinear checked and told him that it was about $200.00.  Akers also asked Martinear to write a statement about what happened the previous day, and Martinear wrote: "I was under the impression that we do not deposit really small amounts of cash [*sic*] that is why I did not do a deposit on Fri 12/05/08." Martinear obtained written statements from Holmes as well as two other employees who had worked the night of the robbery, but when she tried to give the statements to Akers, he indicated that he was only concerned with her statement at that time.[5]   Akers told

---

[5] Akers does not remember whether Martinear gave him the others' statements or not, but he has stated that he did review them at some point.  Akers also stated that he did not investigate the other employees' statements because it was a police matter at that point.

Martinear that he would have to speak with Davis and regional manager Renee Bond ("Bond") because any decision whether NPC would take disciplinary action against Martinear was not his to make.

Akers had a conference call with Davis and Bond, telling them that Martinear had not made the pre-4:00 p.m. deposit according to NPC's revised cash handling policy that she had been instructed on two days prior. Davis stated in her deposition that she, Bond, and Akers discussed "whether we have enough to terminate Ashley [Martinear] for that, and it was yes." NPC contends that it was Bond, and not Davis or Akers, who was the final decision-maker with regard to Martinear's termination. NPC contends that Bond made the decision to terminate Martinear based on her violation of NPC's cash handling policy that resulted in a reported cash loss that NPC would not otherwise have suffered.

On December 7, 2008, Akers informed Martinear that her employment had been terminated. NPC issued Holmes a disciplinary warning.[6] To replace Martinear, NPC promoted Jerrell Browning ("Browning"), a male who had been working as an operations manager

---

[6] Akers completed a theft loss report, dated December 8, 2008, which states: "Ashley Martinear was terminated for failing to follow NPC deposit guidelines and Bryan Holmes was issued a disciplinary warning for not doing withdrawals to the safe." NPC's employee master inquiry records state: "On 12/5/08, Ashley violated cash policy by not following the deposit guidelines by not making a dayshift deposit in accordance with NPC procedures. On 12/3/08, NPC management cash policy was reviewed and signed by Ashley in the area's meeting."

trainee, to the Midfield general manager position.  At the time of Martinear's termination, she was five months pregnant.

After Martinear's termination, Holmes confessed to police detectives that he had actually faked the robbery on December 5, 2008, and had kept all of the money.  Accordingly, NPC terminated Holmes on December 21, 2008.  Holmes later made restitution to NPC for the full amount of the money he had stolen.

On January 9, 2009, Martinear filed an EEOC charge related to her termination, alleging sex, disability, and pregnancy discrimination, as well as retaliation for her 2006 EEOC charge.  After obtaining a right-to-sue letter from the EEOC, Martinear timely filed her complaint in this case on July 30, 2010, alleging that NPC's termination of her was an act of sex and pregnancy discrimination and retaliation in violation of Title VII.  After a period of discovery, NPC filed its motion for summary judgment as to all of Martinear's claims, doc. 26, to which Martinear has responded, doc. 29, and NPC has replied, doc. 31.

## DISCUSSION

### Martinear's Sex and Pregnancy Discrimination Claims

Martinear brings her sex discrimination claim pursuant to Title VII, which precludes employers from discharging "any individual, or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin....", 42 U.S.C. § 2000e-2(a)(1), and her pregnancy discrimination claim pursuant to the Pregnancy Discrimination Act, which provides that the prohibition against sex-based employment discrimination found in § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), applies with equal force to discrimination on the basis of "pregnancy, childbirth, or related medical conditions," and further states that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

The same analytical framework applies to both sex and pregnancy discrimination claims. *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000). Because Martinear does not have or claim to have direct evidence of sex or pregnancy discrimination, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is used. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). Martinear must first establish a *prima facie* case of discrimination, which creates a presumption of discrimination. NPC must then offer a legitimate, nondiscriminatory reason for the employment action to rebut the presumption. If NPC successfully rebuts the presumption, the burden shifts to Martinear to discredit the proffered nondiscriminatory reason by showing that it is

9

pretextual.

In the Eleventh Circuit, "To establish a prima facie case of discriminatory discharge, the plaintiff must show that she (1) was a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment action; and (4) was replaced by someone outside the protected class." *Cuddeback v. Florida Bd. of Edu.*, 381 F.3d 1230, 1235 (11th Cir. 2004).[7]

NPC argues that Martinear cannot establish the second element of the *prima facie* case, i.e., that she was qualified for the general manager position, because she was insubordinate in refusing to follow NPC's revised cash handling policy on December 5, 2008, and because she had received numerous poor performance reviews from her superiors. However, the Eleventh Circuit and other courts have declined to consider issues regarding a plaintiff's job performance at the *prima facie* stage because they are more appropriately analyzed during the pretext stage of the Title VII analysis. *See Holifield v. Reno*, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997) ("Because the issue of Holifield's job performance is intertwined with the issue of whether his termination was pretextual,

---

[7] In following the Eleventh Circuit's instruction that these are the elements of a *prima facie* case of discriminatory discharge, the court agrees with Martinear that she does not have to demonstrate – for purposes of establishing a *prima facie* case – that NPC treated a similarly situated employee outside of her protected classes more favorably.  However, Martinear offers such evidence in support of her pretext argument, which the court will address, *infra*.

10

Holifield's job performance will not be examined until a later stage of the McDonnell Douglas analysis."), citing *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 n.4 (7th Cir. 1994) (declining to address, at the *prima facie* stage, defendant's argument that plaintiff failed to establish that he was qualified for the job because "it is intertwined with the issue of whether Anderson has met his burden of showing that Baxter's reasons for his discharge are pretextual") and *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3rd Cir. 1990) ("To deny the plaintiff an opportunity to move beyond the initial stage of establishing a *prima facie* case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria to determine whether their use was mere pretext."). *See also Fowle v. C&C Cola*, 868 F.2d 59, 65 (3rd Cir. 1988) ("To do otherwise would in many instances collapse the three-step analysis into a single initial step at which all issues would be resolved.") (quoting *Lynn v. Regents of the Univ. of Calif.*, 656 F.2d 1337, 1344 (9th Cir. 1981)).

Given the foregoing, the court finds that NPC's argument that Martinear was insubordinate in violating the revised cash handling policy is more appropriately analyzed during the pretext stage of the analysis, in order to allow the court to examine whether NPC's reason for terminating Martinear is mere pretext. Additionally, with regard to NPC's argument that Martinear received poor

performance evaluations, the court notes that NPC claims that
Martinear was not terminated pursuant to any progressive discipline
policy, but rather solely because she failed to follow the revised
cash handling policy, which states that she may be terminated
without prior warnings.  It appears irrational to allow NPC to
contend that Martinear cannot get past the *prima facie* stage
because her poor performance reviews demonstrate that she was not
qualified for her position, while at the same time accepting NPC's
position that Martinear's past performance problems had nothing to
do with her termination.  The court also notes that while Martinear
may have received several poor performance evaluations, she was
also promoted from assistant manager to general manager at the
Midfield Pizza Hut.[8]  Accordingly, the court finds that Martinear

---

[8] In a case in which the Eleventh Circuit considered a
plaintiff's job performance as evidence that the plaintiff was
not qualified for his or her job, there was "overwhelming
evidence of [plaintiff's] inability to work with others, not to
mention engaging in threats of violence, and insubordination."
*Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290-91 (11th Cir.
2002).  Such overwhelming evidence is not present here.
Additionally, another case cited by NPC for the proposition that
poor performance evaluations may prevent a plaintiff from
establishing that she was qualified for the job, *Ferrell v.
Masland Carpets, Inc.*, 97 F. Supp. 2d 1114, 1124 (S.D. Ala.
2000), is distinguishable on its facts.  *Ferrell* involved the
defendant's practice of hiring employees on a probationary basis
and setting objective productivity requirements for those
employees to be hired as permanent employees.  As such, the court
considered the undisputed evidence that the plaintiff failed to
reach the objective benchmarks during her probationary period,
and was terminated as a result, as evidence that the plaintiff
could not establish that she was "qualified for the position."
There is no evidence of a probationary system in this case, and
Martinear was actually promoted from assistant manager to general

has presented a jury question on whether she was qualified for her position, and because a male, Jerrell Browning (who was by definition not pregnant), took over Martinear's general manager position when she was fired, Martinear has established a *prima facie* case of sex and pregnancy discrimination.

Martinear's sex and pregnancy discrimination claims nonetheless fail under the *McDonnell Douglas* burden shifting analysis.  As its single legitimate, nondiscriminatory reason for terminating Martinear, NPC states that she violated NPC's revised cash handling policy just two days after being instructed on it and receiving a copy of the policy, and because the violation resulted in a reported cash loss.[9]  The intermediate burden is met where:

> [t]he employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.

*Texas Dept. Of Community Affairs,* 450 U.S. at 257.  NPC has met its

---

manager.

[9] Martinear contends that there was actually no cash loss because Holmes eventually repaid the money to NPC, but NPC points out that it lost the use of the money during the time in which it was missing, and that the decision to terminate Martinear was made before the thief made restitution which was an entirely separate matter.

burden here.  *See Holifield*, 115 F.3d at 1564 (noting that the defendant's burden to articulate legitimate, non-discriminatory reasons is "exceedingly light").  As such, "the presumption [of discrimination] raised by the *prima facie* case is rebutted and drops from the case," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993), and the burden shifts back to Martinear to show that NPC's action was a pretext for discrimination.

In support of pretext, Martinear makes several arguments.  She first claims that Akers and Davis were "attempting to get [her] fired."  *See* plaintiff's response, doc. 29, at 33.  As an initial matter, the decision to fire Martinear was not made by Akers or Davis, but by Bond, a fact that Martinear does not dispute. Martinear does argue, however, that because Akers, Davis, and Bond together discussed whether to terminate her, the intent of Akers and Davis should be imputed to NPC under the "cats paw" theory of liability as set forth in the Supreme Court's decision in *Staub v. Proctor Hospital*, — U.S. –, 131 S. Ct. 1186, 1194 (2011).  That decision clarifies that an employer may be liable under Title VII even though there is no evidence of bias on the part of the final decision-maker.[10]  The question in *Staub* was whether an employer could be liable when the employee responsible for the termination

---

[10] *Staub* involved the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311(a), not Title VII, but the Court noted that the statute is "very similar to Title VII." *Staub,* 131 S.Ct. at 1191.

relied on a supervisor's discriminatory animus-driven performance evaluation.  The Court held that "if a supervisor performs an act motivated by [illegal] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Id.* (footnotes omitted).  The presence of another basis for termination, such as an independent investigation by the person who made the decision, does not necessarily save the employer from liability.

By relying on *Staub*, Martinear presumably concedes that there is no evidence that Bond harbored any discriminatory intent or animus with respect to her decision to terminate Martinear.  In any event, *Staub* provides no support for Martinear because in *Staub*, the plaintiff submitted evidence of frequent hostile remarks by his supervisors relating to his military service and his supervisors' intent to terminate his employment.[11] Martinear, on the other hand, has presented no evidence that Akers or Davis made any remarks evidencing an intent to discriminate against her **based on her sex**

_____

[11] In *Staub*, the plaintiff's immediate supervisor scheduled him for additional shifts without notice so that he would "pa[y] back the department for everyone else having to bend over backwards to cover [his] schedule for the Reserves," and he also informed the plaintiff's coworker that the plaintiff's "military duty had been a strain on th[e] department."  Additionally, a higher-level supervisor referred to the plaintiff's military obligations as "a b[u]nch of smoking and joking and [a] waste of taxpayers['] money," and he was aware that the plaintiff's immediate supervisor was "out to get" the plaintiff.  *Staub*, 131 S. Ct. at 1189.

15

**or pregnancy**.  Martinear says that Akers was aware that general managers at the Midfield Pizza Hut routinely violated the written cash policy, which is to suggest that the policy was not strictly enforced.  However, this was before NPC issued the revised cash handling policy clearly stating for the first time that managers who violate the policy resulting in cash loss may be terminated without or without prior warnings.  Martinear also emphasizes that Davis testified during her deposition that her conference call with Bond and Akers centered on whether they "had enough" to terminate Martinear.  This statement is simply not comparable to the remarks made by the supervisors in *Staub*, and certainly does not create an inference that Davis possessed discriminatory intent with regard to Martinear's sex or pregnancy.[12]  *See Springer v. Convergys Customer*

---

[12] Davis is a female, as is Bond, who was the actual decision-maker on Martinear's termination.  The court notes that while not dispositive, these facts are relevant insofar as Martinear is attempting to establish that she was discriminated against based on her gender.  *See Holston v. The Sports Authority, Inc.*, 136 F. Supp. 2d 1319, 1335 (N.D. Ga. 2000) (where the "decision makers are in the same protected class as the employee complaining about an adverse employment decision, the employee faces a more difficult burden in establishing that a discriminatory animus played a role in the decision complained about") (internal citation omitted); *aff'd without opinion*, 251 F.3d 164 (11th Cir. 2001); *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1153 (N.D. Ga. 1997) ("[I]t is extremely difficult for a plaintiff to establish discrimination where the allegedly discriminatory decision-makers are within the same protected class as the plaintiff.").  *But see Castaneda v. Partida*, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (holding that "nothing in

*Mgmt. Group, Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (an employer's reason is not a pretext for discrimination "unless it is shown both that the reason was false, *and* that discrimination was the real reason").

In fact, Martinear only discusses one remark that was made related to her pregnancy, and that is that at some unspecified time during her second pregnancy, Akers asked her whether she would continue to be paid while on maternity leave and asked whether her salary would come out of NPC's labor costs.  This  comment is the quintessential "stray remark" that is "isolated and unrelated to the challenged employment decision" that the Eleventh Circuit has held is insufficient, standing alone, to establish pretext. *Ritchie v. Industrial Steel, Inc.*, 426 F. App'x 867, 872-73 (11th Cir. 2011), citing *Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002) (supervisor's statement that another employee did not deserve her job because she was a woman was not sufficient to show pretext)).  In sum, Martinear has not shown that Akers and/or Davis harbored an animus based on her sex or pregnancy that was intended to cause, and did cause, her termination, essentials for NPC to be liable under the "cats paw" theory in *Staub*.

As additional evidence of pretext, Martinear argues that NPC

---

Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex.").

treated similarly situated male, non-pregnant employees who also violated the cash handling policy more favorably, specifically Bryan Holmes, her shift manager, and Robert Solomon ("Solomon"), an assistant manager of NPC's Pizza Hut restaurant on Green Springs Avenue in Birmingham. The Eleventh Circuit has held that when the proffered legitimate, nondiscriminatory reason is plaintiff's violation of a work rule, "the 'work rule' defense is arguably pretextual when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999). Presumably because she cannot successfully argue that she did not violate NPC's revised cash handling policy, Martinear chooses the latter route. In determining whether employees are similarly situated:

> [I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed. We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.

*Mannicia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999)

18

(internal citations and quotation marks omitted).  The evidence in this record shows that neither Solomon nor Holmes is similarly situated to Martinear.

Martinear submits evidence that on December 1, 2008, Solomon failed to make a cash deposit before 4:00 p.m., and his store was later robbed.  Solomon received a written warning from NPC but was not terminated.  However, these events occurred **before** the December 3, 2008, meeting where Akers instructed the general managers on the revised cash handling policy, which states for the first time: "Managers who violate cash policies resulting in cash loss may be terminated with or without prior warnings."  Because Solomon was not instructed on this revised policy prior to December 1, 2008, he did not violate the same work rule as Martinear, and he is thus not similarly situated to Martinear.  *See Lathem v. Dept. of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment practices.  When an individual proves that he was fired but one outside his class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied . . .") (internal citations and quotation marks omitted).[13]

_____

[13] Martinear also submits evidence that on February 21, 2009, NPC merely issued Solomon a written warning for failing to take the February 16 deposit to the bank until February 19, but he was not terminated.  Martinear has presented no evidence that Solomon had even received, much less been instructed on, the revised cash

Martinear next contends that Holmes violated NPC's revised cash handling policy on the night of December 5, 2008, by stopping to put water in his car's radiator while on the way to make the cash deposit, because the policy states: "It is never acceptable to take a deposit home or to make any stops prior to going to the bank."   Martinear contends that Akers failed adequately to investigate Holmes' behavior as a violation of the revised cash handling policy, and merely issued him a written warning instead of terminating him.[14]   However, NPC responds that Holmes was not present at the December 3, 2008, meeting of general managers, like Martinear, such that he was never instructed on the revised cash handling policy which included more stringent consequences in the event of a cash loss resulting from a policy violation.  Martinear has admitted that Akers instructed all of the general managers present at the meeting, including her, to deliver copies of the revised policy to their management teams and employees and ask them to sign them.  There is no evidence in the record that Martinear gave Holmes a copy of the revised policy before the night of

---

handling policy at the time of this incident.  Assuming, solely for argument, that Solomon had been instructed on the revised policy, the policy states: "Policy violations that DO NOT result in a cash loss will be subject to verbal and written warnings, and the progressive discipline policy."  Solomon's act of "floating deposits," or waiting several days to make a deposit, does not appear to result in a cash loss.

[14] Of course, when Holmes later confessed to detectives that he faked the robbery, NPC terminated him.

December 5, 2008, and Martinear does not argue that she did.  The
court must agree with NPC that because the revised cash handling
policy had not been explained to Holmes just two days prior to the
violations, as it was to Martinear, and in fact, there is no
evidence that Holmes had even seen it, Holmes is not similarly
situated to Martinear, and Martinear cannot use Holmes as a
comparator to establish pretext.[15]   Another reason for non-
comparability is that Holmes was terminated after his theft came to

---

[15] Martinear also argues that two years earlier, in December
2006, Holmes merely received written discipline for violating the
cash handling policy by "floating deposits" instead of being
terminated.  As with Solomon, the revised cash handling policy
was not in effect at that time, so this incident does not support
Martinear's argument that Holmes is a similarly situated
comparator.

Additionally, while Martinear never argues that her
replacement, Browning, is a comparator, she does state several
facts about Browning in the facts section of her brief.  She says
that Browning violated the same cash handling policy twice after
he became general manager of the Midfield Pizza Hut, but NPC
merely issued him written warnings instead of terminating him.
There is evidence in the record that Browning was written up in
October and November 2009 for "failure to utilize a deposit log
and verify your deposit slips daily."  However, NPC argues that
it changed its cash handling policy again sometime early 2009, a
fact that Martinear does not dispute.  Indeed, the record
indicates that Browning signed a different cash handling policy
on June 8, 2009, and nowhere does this policy state that
"[m]anagers who violate cash policies resulting in cash loss may
be terminated with or without previous written warnings," as the
policy that Martinear was instructed on does.  Even if Browning
was operating under the same policy, which he wasn't, his
violations in October and November 2009 do not appear to result
in a cash loss.  Accordingly, to the extent Martinear is
attempting to argue that Browning is comparator, her argument
fails for the same reasons as set forth with regard to Solomon
and Holmes.

light.

Even if the evidence regarding NPC's treatment of Holmes and Solomon shows that NPC did not apply its revised cash handling policy consistently, or that it somehow deviated from its ordinary procedures when it terminated Martinear rather than merely issuing her a written warning, Martinear has still not presented **any** evidence to suggest that NPC was motivated by discriminatory animus in its actions, other than her conclusory statements that this was its reason. *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1244 (11th Cir. 2010) (rejecting claim that employer's "deviation" from its "ordinary disciplinary procedures" was sufficient to establish pretext when employee "did not present any evidence suggesting that [employer] was motivated by a discriminatory animus"); *Delgado v. U.S. Dept. of Transp.*, 709 F. Supp. 2d 1360, 1369 (S.D. Fla. 2010) ("It is not sufficient for Plaintiff to simply identify a perceived shortcoming in the Department's selection process and leave it up to sheer speculation that it was caused by the Department's animus towards a protected class."); *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir. 2000) ("it is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated"), *overruled on other grounds by Manders v. Lee,* 338 F.3d 1304 (11th Cir. 2003).

Absent evidence of any sex or pregnancy discrimination by NPC,

Martinear does not carry the burden of demonstrating that NPC's legitimate reason for terminating her was pretextual. NPC's motion for summary judgment as to Martinear's sex and pregnancy-based discriminatory termination claims will be granted.

**Martinear's Retaliation Claim**

"To establish a claim of retaliation under Title VII [], a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citation omitted). "After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability." *Id*. (citing *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073, 1075 n.54 (11th Cir. 1995)). "The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Goldsmith*, 513 F.3d at 1277 (citation omitted).

Martinear alleges that NPC terminated her because she filed an EEOC charge of pregnancy discrimination in July 2006. However, the lengthy interval of time between Martinear's first EEOC charge in July 2006 and her termination in December 2008 is too remote to satisfy the causation element of her *prima facie* case. The law in

the Eleventh Circuit is clear that "[i]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). A time lapse of over a year between the protected conduct and the adverse action is generally too great to constitute circumstantial evidence of causation. *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). Moreover, the court notes that NPC actually **promoted** Martinear to the general manager position **after** she filed her EEOC charge in 2006. This fact substantiates, if failing to prove (something that NPC need not do), that there is no causal relationship between Martinear's July 2006 EEOC charge and NPC's decision to terminate her more than two years later.

Martinear's arguments in support of a causal connection are unconvincing. Martinear argues that the fact that she was pregnant again when she was terminated is an "intermittent condition" in the chain of causation between her 2006 EEOC charge and her termination. *See* plaintiff's response, doc. 29, at 30. In support, she asserts that "Davis was reminded of [Martinear's] earlier complaints when she was pregnant the first time." *See id.* at 30-31. This conclusory assertion is wholly unsupported by the record. Moreover, the statement that Davis forgot about

Martinear's 2006 EEOC charge until Martinear became pregnant again in 2008 and then decided to terminate her for her 2006 charge is so facially specious as to be disregarded.  To consider it would be to "undercut the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses." *Hankins v. Title Max of Alabama, Inc.*, 2006 WL 4393576, at *8 (N.D. Ala. Sept. 26, 2006) (citation omitted).  *See also Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1984) ("sham" testimony does not create a genuine issue of material fact sufficient to survive summary judgment); *Corwin v. Walt Disney Co.,* 475 F.3d 1239, 1249 (11th Cir. 2007) ("Even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge.").  Martinear also asserts, again without any citation to the record, that "Akers was upset because he believed that he would have to pay her salary out of his store budget while she was on leave." *See id.* at 30.  Even if true, this statement is irrelevant to Martinear's protected activity, which was her 2006 EEOC charge.

Martinear has also failed to show that Bond, the actual decision-maker on her termination, was even aware that Martinear filed an EEOC charge two years earlier.  *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (to show a causal relationship, the plaintiff must show that the decision maker was aware of the protected activity, and that the protected activity

and the adverse action were not wholly unrelated).

In sum, the lack of close temporal proximity, as well as Martinear's failure to show that Bond was aware of her protected activity, are fatal to the causation element of Martinear's *prima facie* case of Title VII retaliation. Accordingly, summary judgment is due to be granted to NPC on Martinear's retaliation claim.

**CONCLUSION**

For the foregoing reasons, NPC's motion for summary judgment will be granted as to all of Martinear's claims. A separate order will be entered effectuating this opinion.

DONE this 5th day of March, 2012.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

26